ALDON BOLANOS, ESQ., SBN. 233915
NINE TWENTY-FIVE "G" STREET
SACRAMENTO, CA 95814
PH.    916.446.2800
FX.    916.446.2828
WWW.ALDONLAW.COM

Attorney for Plaintiffs V. McCarthy and K. Schmitt

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Victoria McCarthy, Katherine Schmitt,<br><br>         Plaintiffs,<br><br>    vs.<br><br>R.J. Reynolds Tobacco Co., DOES 1-10,<br><br>         Defendants. | Case No.  2:09-CV-02495-WBS-DAD<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT |

## I.     INTRODUCTION

The defense has advanced a well-written, intricate and exhaustive motion. But there is only so much lipstick for this pig. The fact of the matter is that there is substantial, substantial evidence to support the claims made in this suit. Ignoring that evidence does not mean it does not exist. Re-characterizing or "spinning" it like a web does not alter its true essence. People, after all, are only human, and they make mistakes in the workplace, they are subject to fits of pique and jealousy and motivated by revenge. Even at R.J. Reynolds and even with the country's leading labor law firm representing them.

In this Opposition and accompanying filings, plaintiffs will show they were both subjected to the most deplorable forms of cruel degradation and venomous

conduct. Conduct which has caused them both lasting physical and mental harm and anguish and caused both their careers to careen sadly away from jobs they both loved. They will show they opposed this conduct through the appropriate channels and by the appropriate means, and all they got in return for standing up for civil rights was to be crushed like a Libyan rebellion.

## II.   STATEMENT OF FACTS

Victoria McCarthy began working at R.J. Reynolds on August 14, 2006. Her supervisor, Michelle Madsen, took to her immediately, calling her "my girl" and expressing excitement about McCarthy being named to a Succession List for promotion in the Fall of 2007. SS 5, 6, 7. This rising star status was affirmed by McCarthy's Performance Evaluations, which were consistently stellar from Day One through October 2007, and by her receipt of numerous monetary bonuses for excellence in the field. SS 5, 6, 7.

Unfortunately, based on the accumulated evidence it appears that Madsen could be crude and déclassé at best, and outright sexually-hostile to her employees at worst. Specifically, she would often banter about whom within the Sacramento Division was having sex and who was not, whether certain women were "top girls" or "bottom girls," whether openly gay employee liked to "take it" or "receive it" and what the best/favorite sex positions are/should be for her employees, about whom she professed an ability to divine their sexual activity based solely on observing their work performance(s). SS 8, 29.

Less innocently, Madsen also had a bad habit of admonishing her employees about their sexual relationships and how those relationships could or would affect their ability to advance within the company. For example, Madsen persistently instructed McCarthy to refrain from having sexual intercourse and to refrain from entering into a romantic relationship with anyone as it would hinder her ability to advance. SS 29. She was told she made the Succession List for

promotion specifically because she did not have a man in her bedroom and attributed her own rise within the company to her refraining from sexual intercourse with her own husband. SS 29. She even went so far as to refer to McCarthy as her "girl" and to place her hand in McCarthy's lap while the two were driving together on company time; on another occasion she caressed McCarthy's leg with her foot under the table at a company lunch discussing promotion opportunities. SS 29.

Conversely, Schmitt was told repeatedly by Madsen to get a man into her bedroom, as this would improve her performance at work. SS 28. She too was subjected to the usual banter from Madsen regarding her favorite sexual positions, whether she was a "top girl" or a "bottom girl," whether openly gay John Walker liked to "take it" or "receive it" and how having one of "those people" [a gay] was detrimental to the team as Madsen could not schedule any team functions or outings for fear her daughter might see a gay man and/or fear that her husband might get into a physical altercation with the gay man. Madsen was also prone to screaming vulgar language directed toward Schmitt, and on one occasion even struck her repeatedly during a work function. SS 28. Schmitt was offended by these comments and complained to Human Resources about them. SS 28.

After McCarthy and Schmitt complained to Human Resources about Madsen's conduct in creating a hostile/oppressive work environment, both were subjected to persistent retaliation at Madsen's hands in the form of real and substantial adverse employment actions. First of all, Madsen knew immediately that it was McCarthy and Schmitt who had complained about her inappropriate workplace conduct because she immediately confronted three co-workers about who was behind the complaint, and all three confirmed it was McCarthy and Schmitt. SS 14. Indeed – that McCarthy and Schmitt were behind the complaint was no secret at all, and Schmitt regularly carbon copied the Human Resources

representative on electronic mail between herself and Madsen. SS 14. Madsen went to McCarthy and stated flatly: "If you have just remained my girl, none of this would have happened." SS 11, 40.

Madsen's clever formula for retaliating against McCarthy and Schmitt for their complaint was to begin systematically rejecting their expense reports for such niggling items as including a twenty-five cent pack of gum on a receipt or contending the copy of a receipt was "not dark enough." SS 13, 37. The reports were repeatedly rejected despite Madsen having never rejected any expense report submitted prior to the September Human Resources meeting in response to the complaint. SS 13, 37.

Then, when McCarthy and Madsen spent work hours revising their expense reports, Madsen would enter the electronic timekeeping system and dock their work hours for not performing enough "field work." SS 36. This resulted in both employees burning significant sick leave hours and vacation hours to cover the lost hours that Madsen had docked, despite that prior to the September 2007 meeting *Madsen had never before altered timecards in this fashion*. SS 34, 35, 36. Worse, Schmitt then received a written reprimand from Madsen for "no call/no show" while she was again revising expense reports at Madsen's own request and with Madsen's consent and knowledge, and eventually was even denied a lateral transfer request because she had received the written reprimand. SS 36.

Madsen further began telephoning both McCarthy and Schmitt *each and every workday* at eight o'clock in the morning to "check up" on them and insist she might "drop in" on any of a number of stores in their respective sales territories to evaluate them. SS 36. Madsen ordered McCarthy to begin generating numerous useless spreadsheets which were never used for any business purpose; And both McCarthy and Schmitt were made to empty and move heavy display fixtures from another employee's storage area despite this never being part of their job as sales representatives. SS 29. Madsen also never did any of these

4

things to any of the other Trade Marketing Representatives; she had singled out McCarthy and Schmitt.  SS 29.

In response, both McCarthy and Schmitt complained repeatedly to Human Resources at this unfair and inhumane treatment, but Human Resources did absolutely nothing.  Consequently, both McCarthy and Schmitt began to experience panic attacks, and both left the company on stress leave as a direct consequence of Madsen's (and later Fedewa's) actions.  SS 39.

### III.    LEGAL AGRUMENT
#### A.    Substantial Evidence Supports the Sex Harassment Claim

To establish a prima facie case of harassment for hostile work environment, a party must show: 1) they were subjected to verbal/physical conduct because of their membership in a protected class; 2) the conduct was unwelcome; and 3) the conduct was sufficiently severe/pervasive to alter the conditions of employment and create an abusive environment.  *Manatt v. Bank of America*, 339 F. 3d 792, 798 (9th Cir. 2003).  Here, the defense motion contends elements one and three cannot be satisfied because the plaintiffs are not members of a protected class and the verbal/physical conduct to which they were subjected was not sufficiently severe/pervasive to be actionable.   Instead, defendant characterizes the bad acts as "occasional, isolated, sporadic or trivial."  This characterization is simply completely out of touch with reality and the facts.

#### B.    Reynolds Did Not Exercise Reasonable Care to Prevent Harassment

R.J. Reynolds next contends that the *Faragher/Ellerth* defense provides a complete defense to the sex harassment claim as a matter of law because 1) there was no tangible employment action taken against the plaintiff(s); and 2) the employer used reasonable care to prevent/correct the harassment or the plaintiff failed to avail herself to corrective opportunities provided.

5

Reynolds' conduct here does not meet either of these two prongs because both McCarthy and Schmitt experienced tangible adverse employment actions in retaliation for their refusal to accede to the hostile work environment and because their repeated pleas to Human Resources regarding the hostile environment fell on deaf ears.

Ms. McCarthy experienced the following tangible adverse employment actions as a result of the hostile work environment and in retaliation for her opposition to it: Her promotion was contingent upon her remaining Madsen's "girl" and not engaging in any romantic relationship with a man, then when she complained she was removed from the Succession List for promotion; her expense reports were systematically rejected; Her timecards were unilaterally docked, resulting in the loss of accrued vacation and sick leave; She was ordered to move heavy fixtures into and out of another employee's storage facility for no apparent rhyme or reason' She was ordered to generate pointless spreadsheets in addition to her normal duties; Her end-of-year bonus was severely undercut and diminished; and her pay was cut to a level below that of all her peers – with the exception of Schmitt, who was the only other peer to have her pay cut.

With respect to Schmitt, she was subjected to eight a.m. telephone calls daily from Madsen under the auspices of "checking in" and the threat that Madsen might "drop in" at any time on the daily route; Her timecards were systematically rejected for petty reasons such as a twenty-five cent pack of gum being included on a receipt or a copy of a receipt purportedly not being dark enough; When she was revising these expense reports, her time was docked and she also lost vacation and sick days; She received a written reprimand for "no call/no show" while again working on the expense reports; Her lateral transfer was denied due to the written reprimand; she too was ordered to move heavy boxes and fixtures from another

1  employee's storage unit despite never having had to undertake this type of manual
2  labor; and she ultimately received less pay than everyone else in the Sacramento
3  Division – with the exception of McCarthy.

5       The defense contention that it is entitled to an absolute defense because it
6  took "all reasonable steps" to prevent or cure the harassment is also unsupported
7  by the evidence. To wit, both McCarthy and Schmitt made repeated and
8  numerous pleas to Human Resources regarding Madsen and their treatment at her
9  hands. HR did nothing. Did HR know that Madsen had undertaken a campaign of
10 morning telephone calls, new job duties, and written reprimands to the two
11 employees who only weeks earlier had made a complaint to HR and received a
12 promise of total anonymity in that regard? Should it have taken the opportunity to
13 check? Of course. But HR did nothing. It checked nothing. It abdicated on its
14 promise of anonymity and left the rank-and-file employees vulnerable to
15 Gahdafi's crushing counterattacks.

### C.     McCarthy and Schmitt *Are* Members of a Protected Class

     Reynolds also contends that McCarthy and Schmitt are not members of a protected class because the adverse actions taken against them were not related to their gender. The curious reasoning seems based on an inference that Madsen created an equal opportunity hostile environment for man and woman alike. Defense Memorandum, page 15, lines 15-17 ("Inappropriate comments in the workplace"). Again, this reasoning flies in the face of the facts.

     Here, both McCarthy and Schmitt experienced a hostile work environment based on their gender. For McCarthy, she was expressly admonished to refrain from having sexual relations with men, and her prospects for promotion depended on it. Madsen called her "my girl" and conditioned advancement within the company upon McCarthy participating in raunchy chatter about Madsen's favorite

7

sex positions, whether she was a "bottom girl" or "top girl" and even laid her hand into McCarthy's lap while she was driving and caressed her leg with her [Madsen's] foot during a work lunch. Most importantly for this analysis, Madsen expressed repeatedly how McCarthy's performance would improve – along with her prospects for promotion – if she refrained from sexual intercourse with a man.

With respect to Schmitt, the facts are similar but not identical. Schmitt was an object of scorn and derision for Madsen in that she was instructed to get a man to engage in sexual coitus with her as it would actually improve her performance at work. Regardless of this difference, the fact remains that Schmitt also was subjected to Madsen's screaming theatrics and histrionics, her inquisitions about Schmitt's personal sexual life and proclivities, whether she was a "top girl" or a "bottom girl," whether openly-gay colleague Jon Walker preferred to "take it" or "receive it" and such similar speculation about the other co-workers in the Sacramento Division. Madsen even physically struck Schmitt twice at a work dinner in frustration at her performance – presumably because Schmitt was/was not following Madsen's directives regarding sexual intercourse.

In light of the foregoing undisputed facts, a reasonable jury could infer that McCarthy and Schmitt experienced a hostile work environment based on their sex/gender. Accordingly, summary adjudication should not be granted on the basis advanced by defendant.

### D.     A *Prima Facie* Case of Retaliation

Reynolds next contends that McCarthy and Schmitt cannot establish a prima facie case of retaliation because they A) never engaged in protected activity; and B) cannot establish causation between the protected activity and the adverse employment action(s). Again, the weight of the evidence crushes these arguments.

An employee has engaged in protected activity under Title VII if she has opposed any practice made unlawful by Title VII. 42 *U.S.C.* §2000e-3(a). Here,

both McCarthy and Schmitt refused to capitulate to their supervisor's oppressive behavior. They complained to Human Resources about a hostile work environment, and about unfair gender-based discrimination being perpetrated against their colleague John Walker, who was essentially terminated because he is openly gay. Literally *within a matter of days* after Human Resources conducted a meeting with all personnel at the Sacramento Division, Madsen undertook a campaign of systematic retaliation against both McCarthy and Schmitt that culminated in a number of tangible adverse employment actions and ultimately separation from the company.

For Reynolds to now assert that Madsen did not know she was retaliating against McCarthy and Schmitt is an assertion which is spectacular in its audaciousness and beyond the pale for advocacy in line with the evidence adduced in discovery. Madsen absolutely knew it was McCarthy and Schmitt who complained because she directly confronted them about it. Specifically, Madsen told McCarthy that it was a "shame" she had reported her [Madsen] and could no longer be her "girl." Madsen directly confronted co-workers about who was behind the complaint and no fewer than three separate co-workers informed McCarthy directly that Madsen had asked and learned it was McCarthy and Schmitt who had blown the whistle. Moreover, the proximity alone of the adverse employment actions to the date of the whistleblowing creates a triable issue because, as set forth below, the retaliation commenced immediately and unrelentingly.

An adverse employment action is a tangible action that materially affects the compensation, terms, conditions or privileges of employment. *Burlington Northern & Santa Fe Rwy. Co. v. White*, 548 U.S. 53 (2006). Here, McCarthy was inexplicably passed over for promotion despite being on the Succession List for promotion when the Human Resources meeting took place. Madsen rejected

her expense reports despite this never having happened before; Her hours were cut causing her vacation and sick time to evaporate; she was made to perform menial tasks such as moving storage boxes and generating pointless and useless spreadsheets, she received unjust written reprimands and her end-of-year bonus was smaller than that to which she was entitled.  Ultimately she received an inexplicable pay cut such that she was the lowest paid Trade Marketing Representative (in a tie with Schmitt only) in the entire Sacramento Division.  To contend that she never suffered any adverse employment action is outright heresy – there is not an adverse action which she did not suffer as a consequence of her protected activity.  And she lost her territory and was terminated and continues to experience debilitating panic attacks.

Schmitt suffered similar indignities immediately after engaging in the protected activity of complaining to Human Resources about a hostile work environment, and participating in the Human Resources "investigation" of Madsen.  In a similar formula which but for its insidiousness would border on brilliance, her expense reports were rejected for such transgressions as having purchased a pack of gum for a quarter on the receipt, or for the receipt copy not being "dark enough."  This had *never* happened before she complained.  Then her timecards were unilaterally altered and hours cut after the fact without any warning or notice.  Again, this had never happened in her entire career with Reynolds until after she complained.  Then she received a written reprimand for failing to properly document her hours!  Panic attacks soon followed and Schmitt too was out on disability leave.

### E.     Cross Filing With EEOC and DFEH Under Work-Sharing Agreement

Reynolds contends that McCarthy and Schmitt failed to exhaust administrative remedies for their California Fair Employment and Housing Act claims.  But the motion ignores a cross-filing system in place under an inter-

10

1  department work-sharing agreement which allows any timely filed administrative
2  complaint with either agency to have been effectively filed with both agencies for
3  the purposes of exhaustion.
4    Here, the charges were filed by a California attorney, within the State of
5  California, for conduct alleged to have occurred in the State of California, and
6  with the EEOC office located in San Francisco, California.  Whether the EEOC
7  office in San Francisco managed to cross-file the charges with the California
8  Department of Fair Employment and Housing is irrelevant because the plaintiffs'
9  have satisfied their obligation to put the employer on notice of the claims through
10 the administrative process, which has now been exhausted.  Under the
11 constitutional analysis set forth in *Campbell v. ARCO Marine*, (1996) 42 Cal. App.
12 4th 1850, and *Allstate Insurance Co. v. Hague*, (1981) 449 U.S. 302, 312-313, a
13 California Fair Employment and Housing Act claim is appropriate and proper here
14 under these facts.
15   Specifically, the Equal Employment Opportunity Commission Compliance
16 Manual states that "**A worksharing agreement provides for dual filing of
17 charges, i.e., each agency agrees to be the agent of the other for the purpose of
18 receiving charges.  When the dual agency (dual filing) provision(s) apply to a
19 specific charge received by either the EEOC or a FEPA (DFEH) the following
20 actions occur simultaneously: (1) the charge is filed with the FEPA; 2) for
21 Title VII the FEPA by virtue of the automatic execution of the waiver
22 provision, terminates (either suspends or completes) processing, thus meeting
23 deferral requirements; and 3) the charge is filed with the EEOC**."  A true copy
24 of this Rule is attached to the <u>Bolanos Declaration</u> concurrently filed as Exhibit D.
25   Here, there is no dispute that a Right to Sue was issued after the timely
26 filing of administrative charges of sex/gender discrimination and harassment.  The
27 defendant has been on notice from Day One of these allegations.  The policy
28 behind exhaustion of administrative remedies, as articulated in the EEOC rules,

has been fulfilled. Plaintiffs' Department of Fair Employment and Housing claims are thereby not barred. See also *Bucyrus-Erie Co. v. Dep't of Industrial Labor and Human Relations of State of Wis.*, 599 F. 2d 205, 213.

### F.     Wrongful Termination/California *Labor Code* Section 1102.5

Defendants read this section too narrowly as requiring a reporting to a governmental agency. Instead, California *Labor Code* §1102.5 makes it unlawful for an employer to retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation. *Labor Code* §1102.5(c).

Here, the employees protested against violations of *Title VII of the Civil Rights Act of 1965*, as well as violations of California's *Fair Employment and Housing Act*. After the employees protested against this activity, they were subject to withering retaliation, as described above. Also, there is absolutely no requirement under California law that a party first file a complaint with the California Labor Commissioner before bringing a claim for violation of Labor Code §1102.5. On the contrary, the sole case cited by Reynolds which purports to make this holding, Ortiz v. Lopez, dealt with a public employee of a municipality and the requirement that he file a claim under the California Tort Claims Act. The Ortiz court cites to another case, Creighton v. City of Livingston, 628 F. Supp. 2d 1199, which dealt with another city employee making a wage and hour claim.

Contrast the defense position with *Lund v. Leprino Foods Co.*, 2007 WL 1775474, <u>a case heard before this very court</u>, where the court recognized there is no "mandatory or exclusive" requirement to file any claim with the Labor Commission, and that "a plaintiff merely has to exhaust her administrative remedies in some manner (in that case via the DFEH and EEOC). Any number of avenues may be used to exhaust them [administrative remedies]."

Moreover, regardless of administrative exhaustion, a plaintiff may still maintain a common law wrongful termination in violation of public policy claim. *Stevenson v. Superior Court of Los Angeles*, 16 Cal. 4th 880, 905.

Here, the plaintiffs were not government employee, and bring their claims under *Labor Code* section 1102.5(c). Not (b). Moreover both plaintiffs did in fact exhaust administrative remedies with the Equal Employment Opportunity Commission. The wrongful termination cause of action must be permitted to remain part of this case.

## IV.   CONCLUSION

For the foregoing reasons, summary adjudication of plaintiff's claims is not appropriate here.

DATED: MARCH 14, 2010            LAW OFFICE OF ALDON BOLANOS

*/s/ Aldon Bolanos, Esq.*

ATTORNEY FOR PLAINTIFFS